## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**ISRAEL RAMOS-RIVERA**,

    Petitioner,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,

    Defendant.

Civil No. 21-1579 (BJM)

## OPINION AND ORDER

Israel Ramos-Rivera ("Ramos") seeks review of the Social Security Administration ("SSA") Commissioner's finding that he is not entitled to disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 423. Ramos contends that the Administrative Law Judge ("ALJ") erred in denying his claim for Social Security benefits. ECF Nos. 1, 11. The Commissioner opposed. ECF Nos. 12. This case is before me on consent of the parties. ECF Nos. 13-16. After careful review of the administrative record and the briefs on file, and for the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify

a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in Appendix 1 of the regulations, impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to step four, at which point the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant's impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The summary that follows is of the pertinent parts of the transcript ("Tr.").

Ramos was born on July 13, 1975, has a ninth grade education, does not communicate in English but does so in Spanish, and worked as a welder from 1999 to 2017. Ramos applied for disability benefits on June 12, 2018, claiming disability beginning September 19, 2017 (alleged onset date) at age 42 due to osteoarthritis, back pain, sciatic nerve pain, left leg pain, and neck and shoulder spasms. Ramos last met the insured status requirement through December 31, 2021 (date last insured).  Tr. 16, 28, 728-734, 756-758, 765.

### *Medical Background*

November 2010 hands and chest x-rays and a whole body scan showed no abnormalities. Tr. 385-387. A May 2012 lumbosacral spine x-ray showed L5-S1 intervertebral disc and facet changes. Shoulder x-ray was normal. Tr. 241, 384. A June 2012 lumbosacral spine MRI shows degenerated L3-L4 through L5-S1 intervertebral discs, bilateral neural foraminal stenosis at L5-S1, and left-sided neural foraminal stenosis at L4-L5. Tr. 242, 383.

### Dr. María González and Dr. Luis Goveo (physical medicine and rehabilitation), Physical Therapy Clinic Génesis I, Clínica de Terapia Física y Acuática

Dr. González treated Ramos in 2013-2014 with physical therapy for intense hand and lower back pain, lumbosacral paravertebral muscles spasms, and osteoarthritis. Range of motion ("ROM") and strength in Ramos's hands and lumbosacral area was reduced. His hands would go numb. He felt cramps in his lower extremities. Ramos walked with difficulty and his ambulatory pattern was unstable, slow, and antalgic. He had good seated and standing balance. Tr. 356-360.

December 2013 hand x-rays revealed normal examination. An electromyography/nerve conduction study ("EMG/NCV") of the hands revealed right moderate median neuropathy, as seen

in carpal tunnel syndrome, and bilateral ulnar nerve entrapment, as seen in cubital tunnel syndrome. Tr. 379-382. January 2014 cervical spine x-rays showed a paraspinal muscle spasm. The lumbar spine x-ray showed degenerative disc disease at the L1-L2 and L5-S1 levels and a paraspinal muscle spasm. A musculoskeletal ultrasound of the left elbow revealed a thickened hypoechoic ulnar nerve, most likely representing inflammatory changes. Tr. 374, 378.

In 2017, Ramos continued with hand pain, swelling, and numbness and low back pain radiating to the left leg with painful left knee flexion. A March 2017 whole-body three-phase bone scintigraphy showed mild arthritic changes at the acromioclavicular joints, hands, lumbar spine, and feet. Labs showed vitamin D and B12 deficiency. Dr. González diagnosed neck muscle spasm, polyarthralgia, right hand carpal tunnel syndrome, cubital tunnel syndrome, osteoarthritis, and low vitamin D and B12. Physical therapy and medications were prescribed. Ramos was referred to a rheumatologist. Tr. 351-355, 361-373.

Aquatic physical therapy notes from May 2018 indicate that Ramos was diagnosed with osteoarthritis. He felt pain in his back, hands, and feet and had difficulty gripping. At the beginning of treatment, Ramos had a generalized muscle spasm and inflammation throughout his back. His pain level started at a nine out of ten, reducing to seven then six during treatment. During treatment, he had a moderate lumbosacral muscle spasm, limited ROM, and generalized stiffness. His coordination and posture were affected. He did not require assistance to walk and his tolerance to standing and walking was fair. Ramos tolerated treatment well and felt improvement but continued to feel leg numbness and hand cramps. Tr. 332-342, 965-978.

In June 2018, Dr. Goveo prescribed eight physical therapy sessions for bilateral hand degenerative joint disease and osteoarthritis and recommended the use of medical marijuana for pain management of Ramos's osteoarthritis (for which Ramos then got his medical cannabis license from the Puerto Rico Health Department). Tr. 326-331, 350, 959-964, 1060. After completing therapy, Ramos reported in July 2018 that he felt a mild improvement in his left hand but not in his right hand. The degenerative joint disease caused deformity in the joints of his right hand fingers. He had difficulty moving his fingers, opening bottles, lifting or holding things, and driving vehicles. Tr. 348. In August 2018, Ramos's fingers still hurt. An August 2018 EMG/NCV revealed cubital tunnel syndrome and carpal tunnel syndrome. Tr. 424-428, 1023-1027.

In February and March 2019, Ramos still felt hand pain and hip pain that spread to his legs. Left hand pain was at an eight out of ten, and right hand and knee pain were at a ten. His ambulation

was affected. He was antalgic with slow cadence. Dr. Goveo diagnosed bilateral carpal tunnel syndrome, bilateral hand degenerative joint disease, and bilateral knee pain. More physical therapy sessions were prescribed. Tr. 421, 433, 435. In May 2019, his hands and knees continued hurting. Ramos showed moderate stiffness in his knees and his ambulation was still affected. Tr. 434.

Physical therapy notes from June 2020 indicate that Ramos still felt the same strong upper and lower back pain after his treatments. His pain was at a nine on a scale of ten. Movement was limited in his neck and shoulders. He had moderate inflammation in the paravertebral lumbosacral muscles. His left leg would also go numb. Ambulation was affected. In September 2020, Ramos's chronic low back pain radiated to the lower extremities. More physical therapy and medications were prescribed. A September 2020 EMG/NCV revealed right peroneal and tibial motor axonal neuropathy. Ramos also complained of bilateral upper extremities pain and numbness. A December 2020 EMG/NCV showed evidence of bilateral carpal tunnel syndrome. Tr. 93-95, 117-120, 502.

In January 2021, Dr. Goveo re-evaluated Ramos and diagnosed bilateral carpal tunnel syndrome. Ramos indicated that his shoulders and hands hurt and that he would drop everything. Dr. Goveo prescribed eight physical therapy sessions for his hands and wrists. The goal was to reduce pain. Rehabilitation potential was fair. Tr. 90-91. Physical therapy notes from February 2021 indicate that Ramos felt shoulders, knees, elbows, back, and neck pain. Ramos placed his left hand pain at an eight on a scale of ten, and his right hand pain at a ten. His hands and fingers were stiff. "Goals not reached. There were no changes in patient's condition." Tr. 63.

**Dr. Karina Vila (rheumatologist)**

From February 2014 to May 2021, Dr. Vila treated Ramos for complaints of persistent and lower back pain, joint pain, and hand numbness and pain. Diagnoses included unspecified osteoarthritis, muscle spasm, carpal tunnel syndrome, and left hand effusion. Prescribed medications included Neurontin, Flexeril, Voltaren, and Cyanocobalamin/vitamin B12 injections. His musculoskeletal system was "abnormal," with bilateral knee crepitance, tender joints, hand deformities, joint tenderness, and positive Tinel's test. "[P]atient unable to work due to hand pain." Throughout the progress notes, Ramos indicated having partial response to aquatic therapy but poor response to physical therapy. Notes remained consistent throughout. Tr. 41-44, 72-75, 113-115, 281-285, 391-392, 899-913, 1047-1050, 1114-1115, 1132-1134, 1147-1150, 1178-1181, 1258-1260.

A March 2017 whole-body bone scintigraphy showed mild arthritic changes at the acromioclavicular joints, hands, lumbar spine, and feet. Tr. 949. June 2017 hand ultrasounds revealed normal results. Tr. 924. An October 2017 lumbosacral MRI showed degenerative changes and spondylosis in the lumbosacral spine, asymmetric bulging of the L4-L5 disk, and lateral recess and neural foramina stenosis at the L5-S1 level. Tr. 923.

An April 2018 hand and wrist x-ray revealed mild osteoarthritis around the distal interphalangeal joints. Wrists were unremarkable. Tr. 922. In June 2018, Ramos felt hand and wrist pain with numbness. Dr. Vila diagnosed severe carpal tunnel syndrome and prescribed a left wrist splint. Tr. 287. Ramos was provided with bilateral wrists splints in July 2018. Tr. 388, 1020. An October 2018 knee x-ray showed mild bilateral osteoarthritis, manifesting as subtle hypertrophic changes at the patella. Tr. 1061.

A February 2019 lumbosacral spine x-ray showed L5-S1 discogenic changes. Tr. 1062. A March 2019 whole-body three-phase bone scan revealed arthritic changes throughout the body. Tr. 1108.

An August 2020 MRI of the right knee revealed a small Baker's cyst and tendinopathy. Tr. 1261-1262. An October 2020 left foot x-ray showed mild osteoarthritis with a small calcaneal spur. Tr. 111.

**State Insurance Fund ("SIF")**

Ramos received treatment under the auspices of the SIF from September 2017 to January 2018. Ramos claimed that he developed arthritis or that his arthritis and back condition worsened due to the type of work he used to perform. His last day of work was September 18, 2017. Ramos felt pain in his hands and low back. Medications and physical therapy for his lumbar back and lower extremities were prescribed.

A November 2017 lumbosacral spine x-ray showed degenerative changes in the lumbar area (straightening of the lumbar lordosis and decreased intervertebral disc space with chronic end plate changes and prominent marginal osteophyte formation noted at L5-S1).

January 2018 notes indicate that Ramos showed arthritic changes in both hands and in the lumbosacral region and was being treated by a rheumatologist (copy of Dr. Vila's medical record contained in the SIF record) who offered to administer a block and do corrective spine surgery, which Ramos refused. Ramos was discharged with partial permanent disability for residual pain

on January 24, 2018, for work-related lumbar sprain and not work-related osteoarthritis, and rheumatoid hands and spine. Tr. 248-265.

**Dr. Verónica Alcántara (family medicine)**

Progress notes from February 2019 to July 2021 indicate that Ramos presented musculoskeletal pain in his back, neck, and lower and upper extremities and swelling, limited ROM in his extremities, knee joint pain, muscle arthritic changes, and impaired movement. Medications were prescribed (Simvastatin tablet, Cyanocobalamin injectable solution, Voltaren gel, Neurontin tablet, Elavil tablet).

During the 2019-2020 period, Ramos was diagnosed with unilateral primary osteoarthritis in his knees, hypertension, mixed hyperlipidemia, arthropathy, polyosteoarthritis, vitamin D deficiency, carpal tunnel syndrome, left hand effusion, major depressive disorder recurrent severe without psychotic features, and anxiety disorder. Tr. 1264. Notes from February 2019 indicate poor medical compliance, cannabis use, and a change of primary care physician. Notes from March 2019 indicate Ramos could ambulate, sit, and stand without assistance. By 2021, Ramos was also diagnosed with left and right shoulder bursitis, bicipital tendinitis in the shoulders, spondylopathy, pulmonary fibrosis, and unspecified inflammatory spondylopathy. Tr. 36-40, 50, 56-61, 68-71, 108-110, 1063-1068, 1109-1113, 1161-1174, 1263-1266.

X-rays taken in February 2020 of Ramos's cervical spine revelaed straightening of the normal cervical lordosis, degenerative disk disease at C3-C4 with mild loss of disk height, and minimal marginal osteophyte formation. As to Ramos's thoracic spine, there was mild thoracolumbar levoscoliosis. As to his lumbosacral spine, Ramos had straightening of the normal lumbar lordosis, degenerative disk disease predominantly at L5-S1 with loss of disk height, endplate sclerosis, and marginal osteophyte formation. There was also apophyseal joints facet osteoarthritis. Both knees were normal. Tr. 1182-1183.

A February 2021 bilateral shoulder ultrasound was performed due to pain and decreased ROM, revealing partial tears of the supraspinatus tendons bilaterally, bilateral supraspinatus calcific tendinitis, and bilateral infraspinatus tendinopathy. Tr. 66-67.

On April 30, 2021, Ramos visited the emergency room for headache and muscle spasm. A cervical spine x-ray showed mild straightening of the cervical lordosis, mild disc space narrowing at C3-C4, and mild grade 1 retrolisthesis of C3 upon C4. Tr. 51. A head CT scan showed normal results. Tr. 50-55.

**Dr. Gustavo Ruiz (psychiatrist)**

Progress notes from March 2013 through October 2015 show that Ramos was diagnosed with major depressive disorder, single episode, moderate. Medications (Prozac, Klonopin) were prescribed. Ramos was cooperative and approachable. His thought process was logical, coherent, and relevant. Ramos was oriented in time, place, and person. His immediate memory was good. His concentration was diminished in 2014 and adequate in 2015 (except for in October which was diminished). His affect in 2013 and early 2014 was flat, then adequate. His judgment was fair and his insight diminished. His sleep pattern in 2013 and 2014 was mostly altered but in 2015 was adequate (more than six hours). In 2013 and 2014, Ramos's mood was depressed and unmotivated. In 2015, his mood was anxious. Ramos had good compliance with medications and appointments. In January and April 2016, his concentration was adequate and his mood was calm (not depressed or anxious). Tr. 197-247.

**APS Clinics**

Psychiatric initial evaluation notes from November 2018 indicate that Ramos's memory (immediate, recent, and remote) and judgment were fair, and his insight was decreased. Medications were prescribed (Elavil, Prozac). Ramos was diagnosed with major depressive disorder, recurrent, moderate, and anxiety disorder, unspecified. November 2018 through August 2020 progress notes indicate that Ramos was anxious and depressed. His concentration was decreased. His health was a stressor. He was also cooperative and his verbal expression was appropriate. His thought process was logical, relevant, and coherent. He did not have delusions or suicidal ideas. He was oriented in time, place, and person. His memory was intact, his judgment was good, and his insight was average. In May 2020, his mood was check-marked as euthymic. In August 2020, his major depressive disorder was severe without psychotic features. Tr. 395-411, 441-449, 463-469, 477-483, 514-517, 527-529, 530, 540-542.

**Dr. Francisco Parra (psychiatrist)**

In June and July 2018, Ramos was diagnosed with adjustment disorder with mixed anxiety and depressed mood. He had non-compliance with other medical treatment. Symptoms included depression, anhedonia, dysphoria, irritability, and affected sleep and appetite. He was alert, oriented in the three spheres, and cooperative. His thought process was organized. His memory was intact. His judgment was good. Psychotherapy and medications (Prozac) were prescribed. Prognosis was fair. Tr. 319-323, 343-346, 952-956, 975-978.

### Procedural History

Along with his application for disability benefits, Ramos filed disability and function reports, in which he claimed that he felt constant pain, cramps, and numbness in his hands. His sciatic nerve was pinched and he felt unbearable back and left leg pain. His joints hurt because of osteoarthritis and carpal tunnel syndrome. His neck and shoulders also hurt. Ramos was also anxious and depressed. He used medications and a prescribed wrist brace.

His conditions limited his ability to walk, sit, stand, lift, squat, bend, reach, kneel, climb stairs, handle, remember, concentrate, and complete tasks. He could not sit or stand for too long. He could walk for twenty to twenty-five minutes before needing to stop and rest for ten to fifteen minutes. His conditions also made it difficult for him to dress, bathe, shave, feed himself, and use the toilet. The pain, cramps, and numbness would wake him up and keep him from sleeping, even with medications.

Ramos did not need reminders to take care of his personal needs and grooming. He read over instructions a few times to avoid confusion. He could follow spoken instructions but sometimes had to have them repeated to him. He could not finish what he started.

His daily routine included spending time in his house watching television or sharing time with the kids and wife. He would accompany his wife to take the kids to school or the park and to do grocery shopping twice a month. His wife accompanied him to medical appointments. He no longer did house and yard chores, handled money, or socialized. He got along well with authority figures. He handled stress with medications and felt frustrated by routine changes. Tr. 177-192, 768-775, 786-793.

The Social Security Disability Determination Program referred the case to Dr. Carmen Ortiz (internal medicine) for a consultative examination, performed on September 18, 2018. Ramos alleged constant body pain, particularly in his hands, shoulders, neck, low back, knees, and feet. He also experienced hands and feet swelling and numbness with very little improvement with medications. Dr. Ortiz observed Ramos enter the room limping mildly from the right leg. He had no limitations opening the door, sitting, or standing. On examination, Ramos presented tenderness to palpation in his hands, right shoulder, upper and lower back, right ankle, and right second toe. ROM was limited in his neck, shoulders, back, hips, and knees. As to his right hand, his right ring and pinky fingers were swollen. He also had right hand Bouchard's and Heberden's nodes. With his right hand, Ramos could finger tap, button a shirt, and pick up a coin but had limitations

gripping, grasping, pinching, and opposing fingers. He had no left hand limitations. Hands muscular strength was a four out of five bilaterally. Shoulder and elbow flexion was normal. Straight leg test was positive bilaterally but upper and lower extremities muscle tone and bulk were normal. Ramos had a red and tender bony bump on the joint at the base of his right big toe (bunion). Dr. Ortiz concluded that Ramos's pain allegations were supported by physical examination findings and correlate with his history of arthritis, bilateral carpal tunnel syndrome and degenerative disc disease. Tr. 1033-1044.

A September 18, 2018, cervical spine x-ray showed normal results. A shoulders x-ray showed calcification in the soft tissues, adjacent to the lesser tuberosity of the right humeral head. A lumbosacral spine x-ray showed narrowing of the L5-S1 disc space, with anterior spondylosis and slight narrowing of the L4-L5 disc space. Tr. 1045.

The case was also referred to Dr. Vilmarie Cruz, clinical psychologist, for a mental status evaluation, performed on September 25, 2018. Tr. 1051-1059. Ramos had depression, anxiety, and panic attacks, and started mental health treatment in 2014. Ramos claimed that his physical conditions affected his ability to function and perform daily tasks. He could not sleep well and got angry and irritated easily. During the day, he slept because of his medications and watched some television when he could. His wife took care of the household chores and kept track of his medical appointments and medication intake. His wife also helped him get dressed sometimes (put his pants on) and did most of the driving when they went out. Ramos indicated having fair social skills. His friends would visit him and he occasionally went to family activities. Dr. Cruz observed that Ramos wore braces on both wrists for support.

During the interview, Ramos seemed anxious, tense, and nervous but was able to establish rapport and was cooperative. Ramos followed instructions and understood the questions posed, sometimes needing rephrasing into simpler words. He could not maintain consistent attention and concentration to answer questions correctly. His thought process was logical, coherent, and relevant. He was oriented in time, person, place, and circumstance. He showed poor insight and judgment. He had poor problem solving skills when answering questions about common sense situations. He was also unable to identify coping skills for his symptoms. As to immediate memory, he could remember two out of two words but had difficulty with five number sequences. As to short term memory, he could remember two out of five words after five minutes. As to recent memory, he could remember what he did within the past forty-eight hours. As to long term

memory, he could remember his birthdate and place, his mother's and school's names, but not the name of a childhood friend or teacher. His general knowledge and intellectual ability appeared to be consistent with his chronological age and academic experience.

Dr. Cruz concluded that "[c]onsidering the information provided by the claimant as part of the history recovered, the clinical interview performed, mental health history and mental status examination, his prognosis regarding his emotional conditions was bad." Ramos's symptoms were consistent with major depressive disorder, recurrent episode, moderate, with moderate anxious distress disorder. Ramos showed lack of motivation and poor attention and concentrations skills. It was Dr. Cruz's opinion that Ramos was currently unable to manage funds because of his difficulty maintaining focus. Tr. 1058.

On October 2, 2018, Dr. Wanda Machado, State agency psychologist, reviewed the medical record under Listing 12.04 (Depressive, Bipolar, or Related Disorders) and assessed that Ramos had moderate limitations to understand, remember or apply information; mild limitation when interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and moderate limitations in adapting or managing himself. Dr. Machado further assessed that Ramos could communicate and follow verbal commands. He was capable of understanding, retaining, and comprehending simple basic work directives of two or three steps. He could sufficiently concentrate during a normal workday and workweek. He could effectively interact with coworkers and supervisors. He could adapt and adjust to minor work changes and hazards and implement basic work goals independently. Tr. 552-553, 557-558.

On October 5, 2018, Dr. Lourdes Marrero, State agency physician, reviewed the medical record under Listing 1.02 (Dysfunction – Major Joints) and Listing 1.04 (Spine Disorders) and assessed that Ramos could lift twenty pounds occasionally and ten pounds frequently; stand/walk for about six hours in an eight-hour workday; sit for about six hours; push and/or pull unlimitedly, including operating hand and/or foot controls; and frequently climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl. He could frequently handle and finger with his right hand. He had no limitations reaching overhead. He could balance and had good ambulation. Tr. 554-556.

The claim was denied on October 5, 2018, with a finding that Ramos was not disabled under SSA regulations. Tr. 160-163, 559-561, 612-615. Ramos requested reconsideration and did not claim new conditions or changes to his existing conditions. Tr. 563, 616, 777, 781.

On May 23, 2019, Dr. Adalisse Borges, State agency psychologist, reviewed the medical record and affirmed the initial mental RFC assessment. Tr. 574, 576-577, 581-583. On June 7, 2019, Dr. Cristina Ortiz, State agency physician, reviewed the medical record and requested a consultative evaluation for possible worsening of physical conditions even though none was claimed by Ramos. Dr. Ortiz assessed that the medical evidence did not support worsening of conditions or warrant further limitations and adopted the initial RFC assessment as written. 574-575, 578-581.

On July 8, 2019, Dr. Carmen Ortiz again examined Ramos, finding mild tenderness trapezius, bilaterally, and limited ROM in Ramos's shoulders, neck, and back. Straight leg test was positive bilaterally. Both his hands had tenderness upon palpation. His right hand showed swelling and limited grip, grasp, pinch, and opposition of fingers. His right index and pinky fingers had a mild swan-neck deformity. Tinel test was positive bilaterally. He had full muscular strength (5/5) in all extremities, except for a 4/5 in his hands. Ramos "alleged some improvement with medications" and his allegations were supported by physical examination findings, diagnostic studies on file, and medical history of carpal tunnel syndrome, lumbar herniated discs, and osteoarthritis. Tr. 1118-1131.

On quality assurance review, Dr. Carlos Jusino opined on July 20, 2019, that the medical evidence revealed that while Ramos presented a history of depression secondary to a physical condition, he was treated and was alert, well-oriented, with decreased concentration and no hallucinations. Tr. 585, 599.

On July 29, 2019, Dr. Gary Friedman disagreed with a portion of the physical RFC assessment previously provided by the other State agency physicians. Dr. Friedman assessed that Ramos could reasonably lift and carry twenty pounds occasionally and ten pounds frequently due to his lower back. Ramos could sit, stand, and walk for six hours. There were no pushing/pulling limitations. Ramos could perform postural activities frequently. Dr. Friedman disagreed with the assessments of unlimited overhead reaching and opined that because of the bilateral shoulder pain and limitations, Ramos could reach overhead occasionally. Also, because of the bilateral carpal tunnel syndrome and left ulnar neuropathy, limitations should not be restricted to the right hand. Handling and fingering should be limited to frequently, with unlimited feeling. There were no environmental limitations. Tr. 585, 600.

On August 1, 2019, the claim was denied on reconsideration. Tr. 164-166, 584, 617-619.

At Ramos's request (Tr. 620-627), a telephone hearing was held on September 16, 2020, before ALJ Ruy Díaz. Ramos and vocational expert ("VE") Marieva Puig testified. Tr. 124-157.

Ramos testified that he stopped working because of his arthritis, pinched sciatic nerve, carpal tunnel syndrome, and cubital tunnel syndrome (elbows). He felt strong pain throughout his body. His hands, lower back, legs, and feet hurt, would cramp, swell, or go numb. His right hand knuckles (dominant hand) would swell more and his right hand fingers were more bent. He had calcifications in his right shoulder and felt pain when he raised his arms. His knees hurt a lot. His big toes were deformed (turned inward). Ramos was also treated for a mental condition since November 2018. He was forgetful and easily irritated. His medications included Prozac, Neurontin, Voltaren, Elavil, a cholesterol medication, and some THS drops or gummies to help him sleep through the pain. Ramos further testified that as a welder, he would lift up to fifty pounds but could no longer carry things, pick up the same weight, or weld. He could now lift five pounds. He could sit for ten to fifteen minutes before he had to change positions. He'd get up and walk for fifteen to twenty minutes until his left leg hurt and he'd sit back down. Ramos did not use an assistive device for walking. He used a wrist brace while sleeping. Tr. 126-146.

VE Puig testified that Ramos's previous job as a welder was skilled, SVP five, medium physical exertion (lift twenty-five pounds frequently and fifty pounds occasionally in an eight-hour workday. For the first hypothetical, the ALJ asked the VE if a person with the same age, educational background, and vocational experience as Ramos with the following limitations could work: carry twenty pounds occasionally and ten pounds frequently, sit for six hours, stand or walk for six hours, push and pull as much as he could lift and carry, and frequently handle, finger, climb ramps and stairs, climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl. The VE answered that he would not be able to perform past work but could perform other work in the national economy such as checker I, garment classifier, or mail sorter (light physical demand, non-skilled). Tr. 146-149.

For the second hypothetical, the ALJ asked if the person was limited to lift or carry twenty pounds occasionally and ten pounds frequently, sit for six hours, stand or walk for six hours, push and pull as much as he could lift and carry, reach overhead occasionally, handle and finger frequently, climb ramps/stairs frequently, climb ladders/ropes/scaffolds occasionally, balance/stoop frequently, kneel/crouch/crawl occasionally, drive a motor vehicle occasionally, and be exposed to vibration and unprotected heights occasionally. He was also limited to performing

simple and routine tasks and could maintain attention for two-hour intervals but not do fast-paced work like in an assembly line. He could have frequent interaction with supervisors and other employees and occasional interaction with the public. The VE answered that such a person could not do previous work but could do the jobs mentioned in the first hypothetical. Tr. 149-150.

For the third scenario, the person was limited to lift or carry ten pounds occasionally and less than ten pounds frequently, sit for six hours, stand or walk for two hours, push and pull as much as he could lift and carry, reach overhead occasionally, handle and finger frequently, climb ramps/stairs and kneel/crouch/crawl occasionally, climb ladders/ropes/scaffolds and balance/stoop frequently, drive a motor vehicle occasionally, and be exposed to vibration and unprotected heights occasionally. He was also limited to performing simple and routine tasks. Judgment was limited to simple work-related decisions. He could maintain attention for two-hour intervals but not do fast-paced work like in an assembly line. He could have frequent interaction with supervisors and other employees and occasional interaction with the public. The VE answered that there are 220 sedentary jobs in the DOT characterized by frequent use of both hands. If the jobs that dealt with the public and production line were eliminated, the occupational base would be significantly eroded with this scenario, and further reduced with occasional reaching overhead. In the sedentary range with these limitations, he could perform surveillance system monitor work. Tr. 150-152.

For the fourth scenario, the ALJ modified the third scenario to handling and fingering occasionally with the right hand (his dominant hand). The VE answered the same response, that the surveillance system monitor job would be the only job available for him to perform. Tr. 152-153.

To counsel's questions, the VE answered that she referred to Ruling 96-9P when addressing erosion to the sedentary occupational base. Counsel also asked if a person that had to take breaks every hour for ten minutes would be able to perform the light or sedentary jobs mentioned. The VE answered no because it exceeded the allowed time off-task in an eight-hour workday. Counsel also asked if a person limited to less than sedentary work could work, to which the VE answered no. Tr. 154-156.

On October 1, 2020, the ALJ found that Ramos was not disabled under sections 216(i) and 223(d) of the Act. Tr. 16-29.

The ALJ sequentially found that Ramos:

(1) had not engaged in substantial gainful activity since his alleged onset date of September 19, 2017 (Tr. 18);

(2) had severe impairments (osteoarthritis, bilateral carpal tunnel syndrome, cervical and lumbar spine degenerative disc disease, shoulders dysfunction, major depressive disorder, and anxiety) (Tr. 18);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526) (Tr. 19);

(4) could not perform past relevant work (Tr. 27) but retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following additional limitations: lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; sit, stand, and walk for six hours in an eight-hour workday; occasionally reach overhead to the left and right; frequently handle and finger items with both hands;  frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel, crouch, or crawl; and occasionally work at unprotected heights, in vibrations, and operating a motor vehicle. Ramos could perform simple, routine tasks and make simple work-related decisions. He could interact frequently with supervisors and coworkers and occasionally with the public. He could pay attention for two-hour intervals but was not able to perform fast-paced jobs such as assembly line work (Tr. 21-22); and

(5) through the date last insured and considering Ramos's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Ramos could perform. Tr. 28.

On October 6, 2021, the Appeals Council denied Ramos's request for review of the ALJ's decision, finding no reason for review and rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-9, 80, 725-727. The present complaint followed. ECF No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determinations that Ramos had the RFC to perform other work in the national economy. Ramos claims that the ALJ's RFC and steps two, three, and five findings were not supported by substantial evidence.

In reviewing the record for substantial evidence that supports or not the ALJ's sequential evaluation findings, I am mindful that the claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)). A medically determinable impairment or combination of impairments "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. It "must be established by objective medical evidence from an acceptable medical source," and cannot be based on a claimant's "statement of symptoms, a diagnosis, or a medical opinion." *Id.*

As a preliminary matter, Ramos claims the ALJ erred at step two because the ALJ failed to consider his severe and non-severe conditions. ECF No. 11, p. 66. Given Ramos's failure to develop even the outline of an argument, I deny any claim made by Ramos as to step two. *See, e.g.*, *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

As to step three, Ramos affirms that his mental impairments, considered singly and/or in combination, meet or medically equal the criteria of listing 12.04 because he has marked limitations based on the "paragraph B" criteria. ECF No. 11, p. 62-63. Ramos does not point to errors he claims were made as to step three physical impairments. I note that Ramos prepared a bulky summary of the record evidence (*see* ECF No. 11, p. 3-60) but does not develop an argument or point to evidence in the transcript to support this claim. I can therefore deem this claim waived as well but will proceed to discuss the ALJ's step three findings given that the mental health evidence that substantially supports this step also substantially supports the mental portion of the ALJ's RFC finding.

The ALJ found at step three that Ramos's mental impairments did not meet listing 12.04 (depressive, bipolar or related disorders) because the "paragraph B" and "paragraph C" criteria were not satisfied. Tr. 20-21. Listing 12.04 (depressive, bipolar, and related disorders) has three paragraphs, designated A, B, and C. A claimant's mental disorder must satisfy the requirements of both paragraphs A and B, or both A and C. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders. While not mentioned in the ALJ's decision, paragraph A of listing 12.04 requires medical documentation of at least five of the listed characteristics (depressed mood, diminished

interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, observable psychomotor agitation or retardation, decreased energy, feelings of guilty or worthlessness, difficulty concentrating or thinking, thoughts of death or suicide). In Ramos's case, some of these characteristics are documented throughout the record (depressed mood, sleep disturbance, and difficulty concentrating).

To satisfy the paragraph B criteria, a claimant's disorder must result in an extreme limitation of one area or marked restrictions in two of the following areas: understanding, remembering, or applying information; interacting with others; maintaining concentration, persistence, or pace; or adapt or manage oneself. Paragraph B criteria use a five-point rating scale. Moderate functioning means that a claimant can fairly carry out the activity independently, appropriately, and effectively, and on a sustained basis, unlike a marked limitation which means that the claimant is seriously limited in functioning in that area. Extreme limitation is when a claimant is unable to function independently, appropriately, and effectively, and on a sustained basis. To satisfy the paragraph C criteria, a claimant must show that he had a "serious and persistent" disorder that lasted over a period of at least two years and that he relied on ongoing medical treatment to diminish the symptoms and had only achieved marginal adjustment. 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders. There was no evidence of paragraph C criteria. Tr. 20-21.

As to paragraph B, the ALJ relied on the APS record in his finding that Ramos had moderate limitations in understanding, remembering, or applying information; moderate limitations concentrating, persisting, or maintaining pace; and moderate limitations in adapting or managing oneself. The ALJ explained that Ramos alleged needing reminders to take care of personal hygiene and take his medications, that he could not finish what he started but could sometimes follow written and verbal instructions; and that he managed stress by taking medications and getting anxious and frustrated with changes in routine. The APS record, which dates from 2018 to 2020, showed that Ramos was anxious and depressed and his concentration was decreased, but was oriented in person, time, and place and had adequate psychomotor activity and insight; relevant, coherent, and logical thought process; intact immediate, recent, and remote memory; and good judgment. Dr. Cruz, on the other hand, made more restrictive findings in September 2018. Dr. Cruz assessed that Ramos's symptoms were consistent with major depressive disorder, recurrent episode, moderate, with moderate anxious distress disorder and that on the day

of the evaluation he had poor attention and concentration skills, showed poor insight and judgment, and was unable to manage funds.

Additional to these record findings by the ALJ, I note that progress notes from Dr. Ruiz from as far back as 2013 indicate that Ramos was diagnosed with major depression and anxiety, was prescribed medications, and in 2015-2016 his concentration was adequate. Dr. Parra's summer 2018 record shows that Ramos was alert, oriented in the three spheres, and cooperative. His thought process was organized, his memory was intact, and his judgment was good. Dr. Machado, State agency psychologist, evaluated the record in October 2018 and assessed, and was so affirmed by Dr. Borges, that under Listing 12.04, Ramos had moderate limitations to understand, remember or apply information; mild limitation when interacting with others (which the ALJ further limited to moderate); moderate limitations in concentrating, persisting, or maintaining pace; and moderate limitations in adapting or managing himself. Dr. Machado further assessed that Ramos could communicate and follow verbal commands. He was capable of understanding, retaining, and comprehending simple basic work directives of two or three steps, sufficiently concentrate during a normal workday and workweek, adapt and adjust to minor work changes and hazards, and implement basic work goals independently. Also noteworthy is that in July 2019, Dr. Jusino reviewed the medical evidence and concluded that Ramos's mental condition was being treated and that he was alert and well oriented but with decreased concentration.

The ALJ also concluded that Ramos had moderate limitations interacting with others because while Ramos claimed having problems getting along with family, friends, and neighbors, Dr. Cruz noted on consultative examination that Ramos claimed to have fair social skills (his friends visited him and he went to family activities on occasion). Dr. Machado also assessed that Ramos could effectively interact with coworkers and supervisors. Dr. Machado's assessment regarding simple basic work directives and interaction with coworkers and supervisors made it into the hypothetical question posed by the ALJ to the VE.

Given the lengthier APS treatment record that describes Ramos's mental limitations in a less restrictive light and other evidence available in the record, I find that there is far "more than a mere scintilla" of evidence to support the ALJ's conclusion (*Biestek*, 139 S.Ct. at 1154) even if Dr. Cruz's one-time examination "arguably could justify a different conclusion." *Rodríguez Pagán*, 819 F.2d at 3.

Jumping to the RFC and step five analysis, Ramos also makes a blanket claim that the ALJ's RFC finding is unsupported by substantial evidence because the ALJ did not properly consider his symptoms, the objective medical evidence, or prior administrative medical findings, as per 20 C.F.R. §§ 404.1520c and 404.1529, and SSR 16-3p.[1] Ramos also posed a series of questions with additional restrictions that he believes the ALJ should have asked the VE. ECF No. 11, p. 63-65. Ramos again does not elaborate or point to transcript evidence to support these claims.

At step five, the claimant has met his burden to show that he is unable to perform past work, and the burden shifts to the Commissioner to come forward with evidence of specific jobs in the national economy that the claimant can still perform. *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982). The Commissioner may satisfy this burden by obtaining testimony from a VE. *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001). The ALJ must express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho*, 670 F.2d at 375. In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* A claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982).

On review of the ALJ's written decision and the transcript, I find that the ALJ at Tr. 19-27 thoroughly discussed Ramos's listed impairments and the persuasiveness of the evidence the ALJ considered to reach the RFC finding and ultimate step five determination. This evidence included the medical records, consultative examinations, and State agency assessments. The persuasiveness of the medical opinions of each medical source is evaluated using the factors listed in paragraphs

---

[1] Ramos alludes to old regulatory framework for evaluating evidence; that the ALJ did not afford proper weight to the treating doctor's notes and opinions (not specifying which doctor, either). As directed in 20 C.F.R. § 404.1520c, the ALJ is no longer required to assign specific weights to any medical opinion or prior administrative medical finding as once required by 20 C.F.R. § 1527 and SSR 96-2p (rescinded).

§ 404.1520c(c)(1) through (c)(5) (supportability, consistency, relationship with the claimant, specialization, and other factors that support or contradict a medical opinion or prior administrative medical finding). The ALJ is not required to discuss each opinion individually. *Richardson v. Saul*, 565 F. Supp. 3d 154, 167 (D.H.N. 2021) (*citing* 20 C.F.R. § 404.1520c(b)(1)-(3)).

I note that the ALJ also considered Ramos's own pain allegations and testimony, finding that his physical and mental impairments could reasonably be expected to cause the alleged symptoms, but his statements regarding intensity, persistence, and limiting effects were not entirely consistent with the medical evidence and other evidence in the record. In assessing credibility, the ALJ must evaluate allegations together with the objective medical and other evidence. *See* 20 C.F.R. § 404.1529(c); SSR 16-3p. The ALJ should also consider the consistency of statements and available evidence, as well as factors such as the individual's treatment history, daily activities, and medications. *See* 20 C.F.R. § 404.1529(c)(4); SSR 16-3p. The ALJ has discretion to determine the credibility of a claimant's testimony by comparing it to other evidence in the record. *See Irlanda Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (finding that the ALJ's credibility determination is entitled to deference).

The ALJ found that Ramos had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following additional limitations: lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; sit, stand, and walk for six hours in an eight-hour workday; occasionally reach overhead to the right and to the left; frequently handle and finger items with both hands; frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel, crouch, and crawl; occasionally work at unprotected heights and operating a motor vehicle; and occasionally work in vibrations. Ramos could perform simple, routine tasks and make simple work-related decisions. He could interact frequently with supervisors and coworkers and occasionally with the public. He could pay attention for two-hour intervals but was not able to perform fast-paced jobs such as assembly line work. This is the RFC that the ALJ posed to the VE through the second hypothetical question.

As discussed for step three, I find that the evidence substantially supports the non-exertional portion of the ALJ's RFC determination. I further note that the RFC assessment provided by Dr. Machado made it into the ALJ's RFC assessment provided to the VE. As to physical limitations, the record establishes a very lengthy and well-documented history of exams, diagnoses, and treatment that spans years (since 2012) for various conditions, particularly back,

hand, and feet pain, cramp, numbness, and reduced ROM. The ALJ found the following conditions to be severe: osteoarthritis, bilateral carpal tunnel syndrome, cervical and lumbar spine degenerative disc disease, shoulders dysfunction, major depressive disorder, and anxiety. While the evidence points to his diagnosed conditions worsening over time, these conditions were being continuously monitored with follow-up appointments with various treating sources and kept at bay with medications and physical therapy, despite some documented concerns of incompliance with prescribed treatment and poor response to physical therapy.

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Individuals capable of performing light work can also perform sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.* In my review of the transcript, I found that the following evidence substantially supports the ALJ's RFC assessment.

Dr. González's 2013-2014 notes indicate that Ramos's hands and lumbosacral ROM and strength was reduced. His hands would go numb and he felt cramps in his lower extremities. Ramos walked with difficulty but had good seated and standing balance. Dr. Vila opined that Ramos was unable to work due to hand pain but that determination is reserved to the Commissioner. Physical therapy notes from 2018 portray a patient with limited ROM, affected coordination and posture, and general stiffness but that did not require assistance to walk and fairly tolerated standing and walking. Ramos reported in July 2018 that he felt a mild improvement of his left hand but none in his right hand. The degenerative joint disease caused deformity in the joints of the fingers of his right hand, and he had difficulty moving his fingers, opening bottles, lifting or holding things, and driving vehicles.

Dr. Ortiz, consultative examiner, noted in September 2018 that Ramos had limited ROM in his neck, shoulders, back, hips, and knees. With his right hand, Ramos could finger tap, button a shirt, and pick up a coin but had limitations gripping, grasping, pinching, and opposing fingers. He had no left hand limitations. Hands muscular strength was a four out of five bilaterally. Shoulder and elbow flexion was normal. Straight leg test was positive bilaterally but upper and lower extremities muscle tone and bulk were normal.

In February, March, and May 2019, Ramos continued to complain about hand, hip, and leg pain. He showed moderate stiffness in his knees. His ambulation was affected and he was antalgic with slow cadence. Dr. Goveo diagnosed bilateral carpal tunnel syndrome, bilateral hand degenerative joint disease, and bilateral knee pain. Other notes by Dr. Alcántara from March 2019 indicate Ramos could ambulate, sit, and stand without assistance. Dr. Friedman's July 2019 RFC assessment was adopted in the ALJ's RFC assessment.

By the time the hearing before the ALJ was held, notes from 2020 and 2021 indicate that Ramos still felt the same strong upper and lower back pain after his treatments. The pain or numbness radiated to his extremities. He would also feel occasional pain when bending over and turning his neck. Movement was limited in his neck and shoulders and his ambulation was affected. Ramos also continued with hand limitations due to his bilateral carpal tunnel syndrome. Physical therapy notes from February 2021 indicate that Ramos felt shoulders, knees, elbows, back, and neck pain. Ramos placed his left hand pain at an eight on a scale of ten, and his right hand pain at a ten (severe). His hands and fingers were stiff. The therapist opined that "[g]oals not reached. There were no changes in patient's condition." Tr. 63.

As mentioned earlier, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodríguez*, 647 F.2d at 222); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, including the evidence discussed above (which is an excerpt available in the record), and given Ramos's lack of argument to support his claims, I find that there is substantial evidence to support the ALJ's findings in this case.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of September, 2023.

*s/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge